Mr. Leon, are you with us? And I'll note to the court that he is signed on under UU Nikki Conner. I am here, your honor. Wait, wait, hold on one second. We're checking to be sure everybody's here first. Mr. Letterman? Yes, ma'am. I'm here. Great. Case number... Okay. Go ahead. Sorry, judge. Case number 20-1427, the District of Nebraska, United States v. Dajuan Sharron. Okay. Mr. Leon, you're on now. Thank you, your honor. My name is Michael Leon, and I am the attorney for the appellate here. My appointment in this case started back in April of 2018. This appeal raises the question of whether the district court should have allowed a duress instruction, and related to that is an instruction which mirrors the language of the Supreme Court case U.S. v. Dixon on the burden of proof on duress. And at the very least, the court should have allowed the defendant to argue its case through the very beginning of this case, through my initial appointment, my meeting with my client, through the two proffers that my client did at the office of the U.S. attorney, through the brief, pre-trial brief, through opening statements and the evidence submitted on behalf of Mr. Sharron, it was clear that he was going to admit the underlying conduct, which was, I believe, almost required to justify a duress defense. What well is it actually required? Don't you have to have some evidence that goes to each of the elements of the defense? And isn't there evidence that he could have walked away? Where he was dropped off, he was in a position where he did not need to undertake the activities he did to effectuate what essentially was the alleged robbery or theft. Your Honor, in every duress case that I've reviewed from the 8th Circuit through the Supreme Court, that is always an issue that's discussed. But is that an issue for the judge or the jury to decide? In this case, he's dropped off 50 feet from the scene. He believes that all individuals at the scene are armed. He believes that all are, he knows that all are in vehicles. He has neither a weapon nor a vehicle or a gun or a phone, excuse me. And he believes that he will get run down and shot. And in fact, if you look at the video of the actual transaction, one of the gentlemen that's in the back of the car tells the CI to run him down and shoot him. I believe that his fear was justified. He knew these gentlemen were dangerous. He knew they had a propensity for selling guns. I think you can look at the testimony even of the investigative officer. He had supervised three prior gun searches with this CI from these two people. I believe the evidence clearly shows that the issue of whether he had that opportunity, you recognize that 50 feet in a car, if you're traveling 30 miles an hour, is one second. I don't believe that the evidence should be, the jury, the judge should be allowed to make that decision based on the evidence that's in this record. But as I said, Mr. Charon testified, previously having proffered, that he admitted the underlying conduct. And he testified quite clearly that he had reasonably feared for his immediate serious bodily injury, and he didn't think he had any options. If you look at this, he didn't even know that this was going down until just before it happened. He had run into these two earlier that day by accident as he was walking near Leavenworth. And they had got out of their car, threatened him. You can look at exhibit 102, you can see that it has nothing to do with the issues in this case. They threatened him because he owed him money. That incident ends, and you can tell from the timestamps on the various videos, that they must have driven from Park Avenue and immediately to meet with the undercover CI. That meeting took place at roughly 1240, last about 20 minutes, nothing happens. There's really no evidence as to why nothing happens other than the testimony that the individual that was supposedly had the guns didn't show up. They leave, and for the next 45 minutes to an hour, the two individuals, Mr. Tapp and Mr. Yard, drive around looking for somebody to be a patsy. They drive back upon my client, they cut him out from his friends, they take him into Hanscom Park, set him down, and he testifies on the record that one of them threatens to shoot him if he doesn't do it. They put him in the car, and they drive back to the same location they were originally, which is a location I'm familiar with because it's kind of in the neighborhood I grew up. But it's near the intersection of Saddle Creek and the radial highway. They drop him off 50 feet away. Now the question is, could he have run away? In every case that I have seen, including Bailey, where the Supreme Court case, where the defense or the jury instruction was given, you can always make the argument. The question is whether that's a question that should be determined by the jury or the judge. Yeah, and I want to just, I know you're getting close to rebuttal, so I don't want to mess the whole thing up. But I want to jump ahead to something that you had said you were going to argue, and that is that you were not allowed to argue the question of voluntariness and intent. When I went through and read the closing arguments, I saw some argument that your client got up in the morning not intending to commit a crime, and he didn't intend to commit the crime during the day, and he didn't intend to commit the crime. There was testimony that you highlighted that emphasized that your client had felt that he'd been taken over, his will had been taken over, and that he'd been threatened. That he thought the drug transaction would force him into a place where this disruption was taking place, and you argued that where your client was dropped off, he didn't have a cell phone, he didn't really have any way to outrun these people, and there were people in the community that were part of this group that were following him, he was afraid. And so all that's in front of the jury, and so wasn't it really argued, and wasn't the question of intent and voluntariness necessarily decided by the jury anyhow? Your Honor, an interesting final argument. I sat there with Judge Rossiter over my left shoulder, the U.S. Attorney over my right shoulder, and if you start looking at around, I think in the transcript about 269, you'll see the discussions where the judge very severely limits me. I can't argue duress. He says I can tell the jury why I'm not arguing, since that was discussed before them. He doesn't tell me that I can do any more than that. When I ask him about whether I can argue voluntariness, he says at page 274, he's likely to sustain an argument. So the whole time I'm arguing, every time I get to any of the issues which you have In fact, on one point, a buzzer goes off during my arguments. It turns out it's the U.S. Attorney's, I think his phone, and it's kind of a light situation. I feel like there's going to be a hook come out and pull me off the stage. But in fact, I do not argue that. If you'll read my final argument, it's essentially a reading of the instructions that were given. This is a question, and I think the evidence was clearly in the record, that should have been decided by the jury. As I looked at the jury, they looked at me. You're approaching about a minute left. Do you want to save it for rebuttal? Thank you, Your Honor. Sure. And so, Mr. Lehrman. Good morning, Your Honor. And may it please the court, my name is Matt Lehrman. I'm an assistant U.S. Attorney representing the appellee in this case, Your Honor. On August 28, 2019, Mr. Sharon was convicted by a jury of robbery of United States property in violation of 18 United States Code 2112. During and in the course of the trial, he had proffered several different jury instructions to include affirmative defenses of coercion, duress, elements, burden of proof, and a voluntariness instruction. The court found that he did not meet his elements with respect to each element of either of those defenses, coercion or duress, and therefore, those instructions were not proper as a matter of law. In particular, he found... Is there really a distinction between duress and coercion in our circuit? I mean, I'll just tell you that I was on the pattern jury instruction committee when we wrote the pattern instruction, and we arrived at the conclusion that duress and coercion were the same thing. And if you look at how we captioned it, it is the same thing. And frankly, I think that distinction is not ascertainable in our jurisprudence, but maybe I'm wrong. Well, Judge, the court actually did specifically state that. I'm referring to the Jankowski case. The court wrote that the defense of duress is separate and distinct from coercion. Now, they're very... What's the year of that case, counsel? Okay, don't worry about it. Our clerks can sure find that. Now, here's the question I have for you. Say it again, your honor. I think that was in 1999. Yeah. It is 99. Yeah. Okay. Thank you. That's probably half of it. And here's the question I have for you. I know you rely on Harper, but you never mentioned Dixon. And Dixon came out in June 22 of 2006. Harper, I know, came out later, but Harper doesn't mention Dixon. And as you know, the other side relies on Dixon, Dixon, Dixon. What would you say about the United States Supreme Court decision in Dixon that you would want us to know? So I think Dixon is unremarkable for a very obvious reason. Dixon didn't go to address the sufficiency of evidence to entitle the defendant to get jury instruction on duress, your honor. It simply stands for the proposition that the due process clause isn't violated by placing the burden of proof on the defendant to show by a preponderance. Now, be careful because the Supreme Court says, and I'm very close to their word, the burden of the defendant by a preponderance of the evidence to show evidence of duress. Absolutely. They did address that. So address Dixon. No, and that's what I'm saying, your honor. That's what the proposition that it stands for, that the due process clause is not violated by placing the burden of proof on the defendant or by showing a preponderance of evidence on each element of an affirmative defense. That's what it stands for. Now, the defendant in this case suggested that Dixon stands for the idea that these are things that you go to the jury as though the district court doesn't play a role as the gatekeeper of evidence to decide the legal sufficiency and whether that's been met by the defendant. And in this case, the district court was correct. There's been no sufficient evidence produced on a single element of the two elements in coercion, which 9.02 or the additional elements that are also contained in duress, which as Jankowski noted, that contains two additional elements. Those being that the defendant didn't recklessly or negligently place himself in a situation where he would have to commit the criminal actor or the other one, which is the direct causal relationship, a reasonably anticipated between the commission of the act and the avoidance of the threatened harm. In particular, there was no sufficient threat of serious bodily injury or death to the defendant. As the district court noted, these are merely subjective beliefs based upon the defendant's own statements. And his credibility was questioned, Judge. During my cross-examination of him, we had asked him— Well, you said the magic word credibility to me, and that sounds like you're making an argument to the defense. Credibility is for the jury. No, it's not. Most importantly, the first thing that has to happen is the district court has to determine whether or not, based upon the standard, the objective standard of whether or not serious bodily injury or death threat actually occurred. That's the first thing that we have to determine. And the only thing that the defendant testified to were these vague and ambiguous statements that something to the effect of, you'll find out what time of day it is. And then he makes a reference to no ifs, ands, or buts. But that's not a specific quote. And there's a hand gesture too, isn't there? He makes reference to a hand gesture as though mimicking a firearm. But importantly, there's no firearm seen. At no point does defendant ever see a firearm. Now, juxtapose that against statements which are more threatening. In Harper, for instance, you don't know who you're messing with. And in that particular case, Judge, you'll recall, defendant was taken to remote location and an actual gun was put to his head, forcing him. Counselor, does it make any difference whether he knew they were gun runners? I don't think there's any evidence to show that he knew that they were gun runners. Judge, there's nothing in the record, because he wasn't part of any prior deals relative to the CI purchasing the guns. So there's nothing in the record to suggest that he knew that they were gun runners. And under these circumstances, I don't think it would be material anyway. He stated that he had previously dealt with at least the one individual on previous drug transactions. And that at no point had Yar ever beaten him up or gone after him or anything. And that's important, because as this court addressed in several other cases in particular, blankenship, that just having a reputation for violence or just having been known as somebody to be tough or intimidating is not enough. For instance, in Logan, that was an individual who had a reputation for violence. And he made the statement, the aggressor says he was going to put Logan six feet under if he was ever crossed. This court held that wasn't enough. There was no evidence of past retaliation on the part of the aggressor in that case. And there was no evidence of what crossing him meant. So it's really more a question of immediacy under Harper. Absolutely. So Harper, Logan, blankenship all address the issue of immediacy. And blankenship, for instance, where you had a neighbor come over with three other individuals and they were threatening blankenship. Blankenship goes out the back door, goes to a neighbor's house, gets a gun, returns and ends up shooting the neighbor. Now, this court held that at the point that blankenship had escaped, the threat's over. There's no additional coercive effects there at that point. And I was very specific in asking Sharon about that issue, specifically about when he was dropped off some 50 or 100 feet away in the auto zone. There was a number of questions that I asked him about, could they see you? Could you see them? He makes a statement of having to peek around the corner that he was free of them. And he actually testifies to having made a choice. In other words, you could have left or you could have stayed. You chose to stay. He acknowledged that. And what he said was that it was the fear of future harm that made him do this as well. In other words, they know where I live. And at some point, even if they were to get in trouble, they would be released from prison. They would come find me. Again, that doesn't meet, it's insufficient to provide him with the necessary coercive effect to continue on with that. This court, as well as in Blankenship, Logan, Harper, the threat of future harm is general, it's speculative, and it's not enough to meet his burden of proof. So just with respect to that element alone, he has failed. His ability to avoid it by either contacting the police or through some other legal mechanism, again, he failed the element in that regard. Not to mention the fact that the proper instructions that he gave did not follow any of the pattern jury instructions. They tended to be a hybrid between duress and coercion, even though they're separate. And again, they contained additional elements. I thought they were the model instructions. I thought he offered the Eighth Circuit model instructions, weren't they? He did not. Well, how close are they at the Eighth Circuit model instructions? Not that we follow those like a religious text, but still, tell me. They're pretty close. That's probably enough, and we can look at them. Yes, sir. Yes, sir. It contains surplus language. The problem is that with respect to the duress, if we're still saying that Jankowski's good law in 1999, but it does not contain the additional two elements. Your time has expired. Thank you. Thank you for the argument. Mr. Lane, we're back for rebuttal. Thank you, Your Honor. The question from the court about Dixon, Dixon, contrary to what the response from the government was, dealt with the burden of proof for the jury to determine on the evidence, not for the judge. It settled a conflict among the various circuits on what the jury should view when looking at the evidence on duress. If you go back to the other Supreme Court case, Bailey, a case where the Supreme Court in a case where the duress instruction was given, or excuse me, what was not given because a failure to show a surrender, but the Supreme Court said it is precisely because a defendant is entitled to have the testimony meet a minimum standard, a minimum standard as to each element of the defense. Now, okay, now Mr. Lane, your time has expired. Quoting the Supreme Court, I was going to let you continue past your time, of course, but you may have one sentence to sum up. Your Honor, in the brief of the U.S. attorney and in the arguments today, the U.S. attorney said there's a credibility question my client, and I don't argue that every witness that testifies has a credibility question, but that is determined by the jury, not by the judge. Thank you very much. It's not a steep burden. Thank you. Thank you very much. Also, I should thank you for taking the assignment under the Criminal Justice Act. The court acknowledges and appreciates you doing that. Ms. Duncan-McKee, that exhausts the calendar for today? It does, Your Honor.